UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| LOGAN N. MILLS | CIVIL ACTION NO. 13-5477 |
| VERSUS | SECTION "C" |
| CITY OF BOGALUSA, ET AL | MAGISTRATE (3) |

CONSOLIDATED WITH

| | |
|---|---|
| DOUGLAS L. DENDINGER | CIVIL ACTION NO. 14-1837 |
| VERSUS | SECTION "C" |
| CITY OF BOGALUSA, ET AL | MAGISTRATE (3) |

*This Pleading Pertains to No. 14-1837*

## AFFIDAVIT OF JULIE M. KNIGHT

STATE OF LOUISIANA

PARISH OF ST. TAMMANY

**BEFORE ME,** the undersigned Notary Public, personally came and appeared:

### JULIE M. KNIGHT

who, after being sworn by me did depose and state that:

1. I am a person of the full age of majority and a resident of Madisonville, St. Tammany Parish, Louisiana and am fully competent to make this affidavit.

2. The statements of fact made herein are made from my own personal knowledge, observation, information and belief.

3. At all times material, I was employed as an Assistant District Attorney (an "ADA") for the 22nd Judicial District Court, for the Parish of St. Tammany, State of Louisiana.



4. Washington and St. Tammany Parishes are both in the 22nd Judicial District and a single District Attorney serves both parishes. At all times material, the District Attorney for Washington and St. Tammany Parishes was Walter Reed.

5. Although the cases that I prosecuted for the St. Tammany Parish District Attorney's office arose almost exclusively in St. Tammany Parish, in 2011, District Attorney Reed assigned me to assist Assistant District Attorney, Leigh Ann Wall, an ADA in Washington Parish, Louisiana, who was the lead prosecutor in the prosecution of one Logan Nestor Mills ("Mills"), which was a Washington Parish case. Mills was charged with several violations of the Louisiana criminal laws as a result of incidents which occurred on April 20, 2011, when Mills and an accomplice robbed the Capital One Bank in Bogalusa, Louisiana, at gunpoint, thereafter fleeing in a stolen vehicle and leading police on a high-speed chase during which gunfire was exchanged between Mills and police, ending in the apprehension of Mills and his accomplice just across the state line into Mississippi.

6. The Mills trial occurred in August, 2012 in the Washington Parish Courthouse, which is located in Franklinton, Louisiana. On the evening of August 20, 2012, after some seven (7) days of testimony, a twelve-person jury convicted Mills of armed robbery, illegal use of a firearm in committing an armed robbery, aggravated obstruction of a highway of commerce and two (2) counts of attempted first degree murder.

7. During the preparation for Mills' prosecution, it became generally known that Mills had filed a federal civil lawsuit against three (3) of the Bogalusa police officers involved in his apprehension – the very three (3) officers he was charged with attempting to kill – and others, accusing them, among other things, of violating his civil rights in conjunction with his apprehension and arrest. I was not named as a defendant in Mills' civil lawsuit and had no particular knowledge of the specific allegations leveled at the defendants in that lawsuit by Mills.

8. On August 16, 2012, with the Mills trial well underway and the witnesses having been sequestered, Mills' mother approached a witness, Officer Scott Seals of the Bogalusa Police Department – one of the officers Mr. Mills was accused of attempting to murder – inside the courthouse where the trial was taking place, and handed him an envelope of papers. Without opening the envelope, Officer Seals brought the envelope of papers to Ms. Wall and informed her of the incident. Ms. Wall reported the incident regarding Ms. Mills' contact with Officer Seals to the presiding judge, who then issued a protective order preventing any further contact between the defendant and anyone acting on his behalf and any sequestered witness. *See,* true and correct copy of Minute Entry of August 16, 2012 in 22nd JDC, Case # 11-CR5-113331, *State v. Mills,* and true and correct copy of excerpt of the transcript of that date containing the rendition of the protective order are attached hereto, *in globo,* as Exhibit A. Prior to that time, I had never even seen the complaint in Mills' Suit and I did not read the complaint at that time or at any other until after I was

served with Dendinger's Complaint in the instant action.

9. My perception and observation of the atmosphere in the courtroom surrounding the rendition of the jury's verdict was that it was extremely tense, volatile and highly-charged.

10. Following the rendition of the jury's verdict, the polling of the jury and the completion of some housekeeping issues, court adjourned shortly after 7:15 p.m. on August 20, 2012. *See* true and correct copy of Minute Entry of August 20, 2016 in *State v. Mills,* together with true and correct copy of excerpt of transcript of that date containing jury verdict, attached hereto, *in globo,* as Exhibit B.

11. Mills' family members left the courtroom shortly after court was adjourned. Shortly thereafter, I and others, including Officer Chad Cassard, another Bogalusa police officer that Mills had just been convicted of trying to murder – were leaving the courthouse about the same time. At the time, dusk had begun to settle. The weather conditions were very cloudy and the ground was wet, as it had been raining. I was just behind Officer Cassard directly inside the glass door to the courthouse which was opened and Officer Cassard had just crossed the threshold of the door when I observed an unidentified man in shorts approach Officer Cassard with his hands raised. From my vantage-point and perspective, the unidentified man appeared to have hit Officer Cassard in the chest with an envelope that the unidentified man was holding in his open hand. I heard the unidentified man say words to the effect of "served, brother," heard the sound of the envelope simultaneously hitting Officer Cassard's chest and then, saw the man turn and leave.

12. When the unidentified man (whom I now believe as a result of this lawsuit to be the plaintiff, Douglas Dendinger) approached Officer Cassard, he did not identify himself, did not say that he was there to serve process and, from my vantage point and perspective it did not appear that he had placed anything in Officer Cassard's hand, but in his chest, as stated above.

13. I was startled and frightened by the encounter between Officer Cassard and the unidentified man (hereinafter, the "Incident"), which occurred just in front of me. I had just completed a high-profile prosecution, where the courtroom atmosphere was, as stated above, extremely highly charged and there having been a prior encounter involving Mills' mother and another witness/victim a few days earlier. In the ensuing chaos, I was told by a Washington Parish Sheriff's deputy that I (and the others who had been on the steps at the time of the Incident) should proceed to the Sheriff's Office to provide a statement setting out what I had witnessed.

14. Although I was anxious to leave Franklinton and go home to Madisonville to be with my family, I phoned my husband to let him know that I would be delayed coming home because I had to go and write a witness statement relating my observations of the Incident. I then immediately proceeded to the Washington Parish Sheriff's

Office/Jail, as instructed, and wrote my witness statement (hereinafter, my "Written Witness Statement"). My Written Witness Statement was a true and accurate account of the Incident as I had observed and perceived it at the time. I signed and dated my Written Witness Statement and indicated thereon the time that I completed it, which was at 8:00 p.m. Immediately after I completed writing my Written Witness Statement, I left the Washington Parish Sheriff's Office/Jail. Officer Kendall Bullen was kind enough to walk me to my car with his umbrella, since it was raining and I did not have an umbrella with me. I then got into my car and drove to my home to Madisonville, approximately forty (40) miles away. I arrived home at approximately 9:00 p.m. A true and correct copy of my Written Witness Statement is attached hereto as Exhibit C.

15. I did not discuss the Incident or my Written Witness Statement with any of the other witnesses to the Incident prior to giving my Written Witness Statement.

16. I did not coordinate or conform my Written Witness Statement with that of any other witness.

17. I did not contact District Attorney Reed, or anyone else in the District Attorney's Office on the evening of August 20, 2012, regarding the Mills Verdict, the Incident or my Written Witness Statement.

18. I did not provide any information whatsoever to any law enforcement official on the night of the Incident other than my Written Witness Statement and certainly did not provide any advice to any law enforcement official, including Ms. Wall, D.A. Reed, anyone in the Washington Parish Sheriff's Office/jail, nor any other law enforcement official, at that time, nor at any other time, regarding any crimes with which I thought the unidentified man could be charged, nor any other advice regarding how to proceed in the matter.

19. I was not present when Mr. Dendinger was arrested; nor was I present in the Washington Parish Sheriff's office/jail when he was brought into the Sheriff's Office for booking. I was either on my way home to Madisonville or already at home in Madisonville. I did not and could not have whistled anything at the man, laughed at him or otherwise taunted him in any fashion, as I was not present at the time.

20. I was not contacted by anyone in the District Attorney's Office or the Washington Parish Sheriff's Office when the case (of the unidentified man whom I now know to be Mr. Dendinger, the plaintiff in this case) was screened, nor did I participate in the screening of the case.

21. I did not participate in any manner whatsoever in the decision to charge or prosecute Mr. Dendinger.

22. I was never contacted by anyone in the District Attorney's Office or the Washington Parish Sheriff's Office regarding the prosecution of Mr. Dendinger, nor did I ever discuss the prosecution of Mr. Dendinger with anyone.

23. I did not ever appear in court as a prosecutor, or as a witness, or at all, in connection with Mr. Dendinger's prosecution.

24. I have never discussed the Incident, my Written Witness Statement, or Mr. Dedinger's prosecution with anyone in the Louisiana Attorney General's Office.

25. At the time I prepared my Statement, I was unaware of Mr. Dedinger's identity and remained unaware of his identity until he filed and served the instant complaint against me and others in the United States District Court for the Eastern District of Louisiana (Civil Action No. 14-1837) (the "Dendinger Complaint").

26. I was not aware that the man I observed approach Officer Cassard on the evening of August 20, 2012 was related to Mr. Mills until I was served with the Dendinger Complaint.

27. In sum, I did not prosecute, nor was I involved in the prosecution of, Mr. Dedinger in any manner whatsoever. My *only* involvement in anything to do with Mr. Dendinger is that I observed the Incident and provided a true and accurate Written Witness Statement of what I had observed. I did not know Mr. Dendinger's identity at the time of the Incident or at the time I gave my Written Witness Statement. I did not know that Mr. Dendinger was related to Mr. Mills at the time of the Incident or at the time I gave my Written Witness Statement. Mr. Dendinger did not give any indication that he was there on the courthouse steps on the evening of August 20, 2012 to serve process and I did not know that he was there to serve process. I was not present when Mr. Dendinger was arrested or brought to the Washington Parish Jail for booking and did not participate in any taunting of the man.

_____
JULIE M. KNIGHT

Sworn to and subscribed before me, Notary Public, this 2nd day of March, 2016.

_____

**CONNIE R. BLUE**
NOTARY PUBLIC, ID # 12003
PARISH OF ST. TAMMANY, STATE OF LOUISIANA
MY COMMISSION EXPIRES AT DEATH.